UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

**FILED**

2017 NOV 20 P 1:39

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* *[UNDER SEAL]* <br><br> **Plaintiffs,** <br><br> v. <br><br> **[UNDER SEAL]** et al., <br><br> **Defendants.** | FILED UNDER SEAL <br> PURSUANT TO <br> 31 U.S.C. §3730(b)(2) <br> AND COURT ORDER <br><br> DO NOT PLACE IN PRESS BOX <br> DO NOT ENTER ON PACER <br><br> Case No. 1:17-cv-1325 (LMB/MSN) |

**UNDER SEAL COVER SHEET**

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
## (ALEXANDRIA DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| COMMONWEALTH OF VIRGINIA | ) |
| AND THE STATES OF CALIFORNIA, | ) TO BE FILED UNDER SEAL |
| FLORIDA, TEXAS, | ) |
| ILLINOIS, NEW YORK, TENNESSEE | ) CASE # 1:17-CV-1325(LMB/MSN) |
| ex rel., James Cesare | ) |
| Plaintiff, | ) JURY TRIAL DEMAND |
| v. | ) |
| Practice Velocity, LLC | ) |
| And | ) |
| David Stern, M.D. | ) |
| (In his individual Capacity) | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

1. Relator James Cesare brings this Complaint on his own behalf as well as on behalf of the United States, the Commonwealth of Virginia, and the states of California, Florida, Texas, Illinois, New York and Tennessee pursuant to the qui tam provisions of the federal False Claims Act as well as the false claims statute of each state.

## PARTIES

2. Relator James Cesare is a resident of the State of Maryland. Relator is the founder and CEO of Bay Area Healthcare Advisors, LLC, a Delaware limited liability company that, among other things, performs independent review work for healthcare providers operating under a Corporate Integrity Agreement ("CIA") with the United States.

Page 1 of 15

3. Relator is the original source of the information alleged herein, and has met all procedural requirements of 31 U.S.C. § 3730(b)(2) prior to filing this Complaint.

4. Defendant Practice Velocity, LLC is, upon information and belief, an Illinois limited liability company owned and operated by David Stern. The company was founded in 2002.

5. Practice Velocity provides software solutions for more than 1,200 urgent care clinics operating in all 50 states. Its products include computer tablet-based diagnostic record systems, specialized billing systems, practice management software and a patented record template system. Practice Velocity bills itself as a one-stop solution for electronic medical records ("EMR").

6. Defendant Dr. Stern is the founder and CEO of Practice Velocity, LLC. Dr. Stern graduated magna cum laude from Houghton College and earned his medical degree from Jefferson Medical College in Philadelphia. He completed a residency in internal medicine at the Pennsylvania State University Hospital. After his residency, he was appointed chief resident and instructor of internal medicine.

7. As explained herein, Dr. Stern is personally aware of and personally responsible for the false claims at issue in this case.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

9. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a). Defendants transact or have transacted business in the Eastern District of Virginia. At all

times relevant, defendants sold their proprietary software products, which caused the false claims complained of in this Complaint, to healthcare providers within this district and within this division.

10. Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 31 U.S.C. §3732(a) because the defendants can be found in and transact or have transacted business in this district. At all times relevant, defendants sold their proprietary software products, which caused the false claims complained of in this Complaint, to healthcare providers within this district and within this division.

## ALLEGATIONS COMMON TO ALL COUNTS
## THE MEDICARE PROGRAM

11. The Social Security Act, codified in Title 42 of the United States Code, authorizes the payment of certain benefits for medical treatment of persons who are qualified because of age, disability, or affliction with end-stage renal disease. This health care benefit program is otherwise known as Medicare. Reimbursement of physicians' charges is governed by Medicare Part B, 42 U.S.C. §§ 1395j through 1395w-5. Funds to support these programs are appropriated from the United States Treasury as required pursuant to 42 U.S.C. § 1395w.

12. Specific types of medical services and supplies are covered under Medicare Part B. Benefits include physicians' services as well as incidental services and supplies commonly provided in the performance of physicians' services and certain diagnostic services, 42 U.S.C. §§ 1395k(a), 1395x(q), 1395w-4(f)(4)(A) (physicians' reimbursable services), and 1395xx(a)(1). See generally 42 C.F.R. Parts 410, 411, 414, 415, and 422.

13. Under Medicare Part B, a physician has two options for receiving payment for medical services to Medicare beneficiaries. A physician may take an assignment of the coverage from a qualified patient to obtain reimbursement under Medicare. 42 U.S.C. 1395u(h)(1); 42 U.S.C. § 1395u(i); 42 C.F.R. § 414.20. Physicians may become participating physicians and accept assignments under 42 U.S.C. § 1395u(h).

14. Participating providers and physicians are required to follow billing, accounting, and documentation requirements imposed by regulations and the fiscal intermediary. 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.5. Alternatively, a physician may decline to accept assignment and obtain a fee schedule amount plus the beneficiary's coinsurance and any difference between the physician's charge and the fee schedule amount, up to 115 percent of said fee schedule amount. See, e.g., 42 U.S.C. § 1395w-4(g)(2)(C); 42 C.F.R. § 400.202. Physicians declining to become participating physicians may accept or decline assignment on a case-by-case basis.

15. The Medicare statute controlling payments under Part B establishes the schedule for reimbursement of physicians' services. 42 U.S.C. § 1395w-4; 42 C.F.R. Part 414, subpart B; 42 C.F.R. Part 405, subpart E; 42 C.F.R. Part 415, subpart C. The relative values of the components making up a physician's services are defined in 42 U.S.C. § 1395w-4(c) and 42 C.F.R. § 414.22.

16. The Medicare statute requires the creation of regulations controlling the factors used to determine the level of payments for various physician services to Medicare beneficiaries. 42 U.S.C. § 1395u(b)(8); 42 U.S.C. § 1395w-4(c)(5); 42 C.F.R. Part 414. Providers and physicians bill services according to designated CPT code numbers corresponding to the level of medical service provided. 42 C.F.R. §§ 405.512, 414.40, and 424.32(a)(2).

## MEDICARE PART B REIMBURSEMENT AND CPT CODES

17. The physician fee schedule is the basis for Medicare reimbursement for all physician services since January of 1992. 42 U.S.C. §§ 1395w-4(a)(1). Section 1848(c)(5) of the Act required the Secretary of HHS to develop a uniform coding system for all physician services. 42 U.S.C. §§ 1395w-4(c)(5). The American Medical Association's "Current Procedural Terminology" ("CPT") maintains a numeric coding system for physicians' services.

18. Under the statutorily mandated system establishing five-digit billing codes for use in making Medicare claims for reimbursement, various codes and modifiers are used to designate the level of service provided. 42 U.S.C. § 1395w-4(c)(4).

19. Under Medicare Part B, physicians (and other service providers) treating Medicare beneficiaries submit claims for reimbursement to a Medicare carrier or fiscal intermediary on forms numbered "CMS-1450" and "CMS-1500," respectively. 42 U.S.C. § 1395m(a); 42 U.S.C. § 1395w-4(g)(4)(A); 42 C.F.R. Part 424, subpart C; 42 C.F.R. §§ 424.5(a), 424.32.

20. These forms require the provider of services or physician to provide an identification number, patient information, and the five-digit code identifying the services for which reimbursement is sought. Forms CMS-1450 and CMS-1500 list those services provided to a single patient and may include a number of codes for treatment, but each constitutes a single claim for reimbursement.

## MEDICARE PAYS ONLY FOR THOSE ITEMS AND SERVICES THAT ARE REASONABLE AND NECESSARY

21. Section 1862(a)(1)(A) of the Act, 42 U.S.C. §§ 1395y, states that "no payment may be made under Part A or Part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury . . ."

22. Section 1833(e) of the Act requires that providers furnish "such information as may be necessary in order to determine the amounts due" to receive Medicare payment. 42 U.S.C. §§ 13951. Claims for services that lack sufficient documentation to show that care was provided at the level for which reimbursement is sought do not meet the requirements of Section 1833(e).

23. Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes. The medical record chronologically documents the care of the patient and is an important element of contributing to high quality care.

24. The medical record also serves as the legal document to verify the level care provided in the CPT code. See 42 C.F.R. § 482.24(c). Documentation is the source of accurate Medicare insurance claim review and payment.

25. Under CMS requirements, the documentation of each patient encounter should include: (1) the reason for the encounter and relevant history, physical examination findings, and prior diagnostic test results; (2) the assessment, clinical impression, or diagnosis; (3) a plan for care; and, (4) the date and legible identity of the observer.

26. Although CMS requires that the CPT codes reported on the health insurance claim or billing statement be supported by the documentation in the medical record, the HHS Office of Inspector General has found repeated problems with lack of documentation

related to physician upcoding for evaluation and management services. CMS has determined that physician coding deficiencies cost taxpayers tremendous amounts of money.

27. In particular, coding deficiencies for evaluation and management services ("E/M") have been vulnerable to fraud and abuse. Between 2001 and 2010, Medicare payments for Part B goods and services increased by 43 percent, from $77 billion to $110 billion. During this same time, Medicare payments for E/M services increased by 48 percent, from $22.7 billion to $33.5 billion.

## THE MEDICAID PROGRAM

28. Under the Medicaid provisions of the Social Security Act, States are authorized to create state health care benefit programs and obtain federal financial participation in those programs. 42 U.S.C. §§ 1396 through 1396w-5. See also 42 C.F.R. § 430.10. Medicaid is a joint federal-state program providing health care benefits primarily to the poor and disabled. Federal participation is largely limited to the provision of matching funds and enforcement of minimum administrative standards. Appropriations are made from the United States Treasury to support the Medicaid program. 42 U.S.C. § 1396. See generally 42 C.F.R. Parts 430, 431, and 433.

29. Medical assistance available under Medicaid is defined by 42 U.S.C. § 1396d. See also 42 C.F.R. § 433.56. Subject to state regulations, vendors of medical services seeking reimbursement must use claim forms and standardized coding of medical services as required by state law.

30. In most or all scenarios, the Medicaid requirements for billing and payment are identical to those for Medicare billing and payment described above.

## CPT CODES – 99213 vs. 99214

31. Medicare's Documentation Guidelines for Evaluation and Management Services require that a 99213-level office visit (otherwise known as a level-3 established patient office visit) requires medical decision making of low complexity.

32. More complex decision-making is required for a 99214-level office visit (i.e., a level-4 encounter.)

33. A level 4 established office visit (99214) represents the second highest level of care for established office patients. It also represents the most expensive level of care. Usually the presenting problems are of moderate to high severity.

34. Two out of three of the following are required to support a 99214 code: (1) detailed history; (2) detailed Exam; and/or (3) moderately complex medical decision-making.

35. Alternatively, 25 minutes spent face-to-face with the patient is required if the CPT coding is based on time.

36. In all situations, to bill for a 99214 office visit, the appropriate documentation must be included.

37. Medicare and Medicaid both allow the provider to bill only for the medically necessary portion of the visit. Only the necessary services for the condition of the patient at the time of the visit can be considered in determining the appropriate levels of an E/M code.

## COUNT ONE – SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) AND (B)
## (AGAINST ALL DEFENDANTS)

38. All the preceding paragraphs are reincorporated by reference.

39. Relator's company, BAHA, performs work as an independent review organization ("IRO") for healthcare providers operating under a CIA with the United States.

40. In that capacity, BAHA was retained in 2016 to serve as an IRO for J.H., a physician in Jacksboro, Tennessee. As part of the IRO work BAHA was to audit any business entity in which J.H. had an ownership interest. This included a clinic owned and operated by J.H. known as Neighborhood Urgent Care.

41. The 2016-2017 reporting period was the third-year of a five-year term required by a CIA between J.H. and the Office of the Inspector General. The claims reviewed by BAHA therefore ran from January 26, 2016 to January 27, 2017.

42. In March of 2017, relator conducted an independent audit of J.H. and his clinic. Relator found an incredibly high number of evaluation and management code 99214.

43. Relator used the statistical software known as "RAT-STATS;" this software was developed by the OIG to perform this exact type of analysis.

44. Random patient records were chosen using the methodology required by the RAT-STATS software. A total sample size of 25 patient files were chosen. Of these 25 patient charts, 23 of them contained errors that had led to overpayments, meaning there was an error rate of 92%.

45. Following these results, BAHA did a full sample review of patient charts for the 2016-2017 period which was required if the error rate in the discovery sample exceeded 5%. A complete review of all claims showed an error rate of more than 97%.

46. The total distribution of claims for that year was as follows:

| CPT | Volume |
|---|---|
| 99211 | 10 |
| 99212 | 15 |
| 99213 | 175 |
| 99214 | 6,822 |

47. Relator prepared a report on these overbillings as he is required to do.

48. When relator inquired about the reason for these errors, he was told by S.D., CEO of the clinic operated by J.H. that the clinic relied completely on the Practice Velocity Electronic Medical records system for claims submitted to third-party payors.

49. S.D., J.H., and others informed relator that they had done nothing more than following the promptings of the Practice Velocity EMR software and had relied on the bills and codes generated by the software.

50. Relator therefore determined that it would be necessary to involve Dr. Stern, the founder and owner of Practice Velocity, LLC in this discussion, and a conference call with Dr. Stern was scheduled.

51. Dr. Stern was provided with the claims information and reports prepared by relator and his firm before the conference call.

52. Dr. Stern plainly informed relator and others on the conference call that in his view, the EMR software designed by his company had worked exactly as it was supposed to work.

53. Dr. Stern's position was confirmed in a letter dated March 21, 2017. In that letter, Dr. Stern wrote: "From my experience as a Certified Professional Coder (CPC) for the past 17 years and writing the column for the Journal of Urgent Care Medicine for over 10 years, I believe that the clinic's use of this methodology is a commonly-used and compliant methodology for coding in the urgent care setting."

54. Relator pointed out to Dr. Stern (both on the conference call and otherwise) that no documentation existed to support the use of "overarching criteria" to support such a high rate of 99214 codes.

55. Dr. Stern's response was that 100% of the 99214 E/M codes were correct because the "overarching criteria" was the provider's understanding of the patient's symptoms at the time of the clinical visit.

56. More specifically, in his March 21, 2017 letter Dr. Stern wrote: "As per previous discussion, the auditor has confirmed that the methodology used here for 'Overarching Criteria' is the auditor's sense of the acuity of the case and presenting complaint."

57. Relator was very concerned by Dr. Stern's response; following this conference call, relator urged J.H. to cease using the Practice Velocity software and instead bill all patient visits manually.

58. J.H. and the other providers at his clinic followed BAHA's recommendations and ceased relying on the Practice Velocity EMR system to generate its CPT codes. In fact, an immediate control was implemented and an outside independent medical claims coding company reviewed 100% of the claims submitted to third party payors.

59. With no change whatsoever other than the outside independent claims review, usage of the 99214 CPT code fell from more than 95% of all established patient visits to 39% of all established patient visits.

60. In total, usage of the Practice Velocity EMR system caused J.H.'s clinic to submit more than $900,000 worth of false claims to the Medicare and Medicaid programs from January of 2016 to January of 2017.

61. Those claims were false because they either billed for medically unnecessary services or billed for medical services that were not actually rendered.

62. In addition those claims were false because they lacked the documentation required by Medicare and Medicaid regulations.

63. CMS requires that the CPT codes reported on the health insurance claim or billing statement be supported by documentation in the medical record; documentation to support the claim is therefore material to the government's decision to pay.

64. As a result, the United States has been damaged.

## COUNT TWO
## VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
**CALIFORNIA CODE § 12651(a)(1) and (a)(2)— Knowingly presenting a false claim for payment or approval and Knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim**
**(Against all Defendants)**

65. All the preceding paragraphs are reincorporated by reference.

66. All the above allegations resulted in false claims to the California Medicaid program, otherwise known as Medical.

67. As a result, the state of California has been damaged.

## COUNT THREE
## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
**VIRGINIA CODE § 8.01-216.3(A)(1) AND (A)(2)—Knowingly presenting a false claim for payment or approval and Knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim**
**(Against all Defendants)**

68. All the preceding paragraphs are reincorporated by reference.

69. All the above allegations resulted in false claims to the Commonwealth of Virginia's Medicaid program.

70. As a result, the Commonwealth of Virginia has been damaged.

## COUNT FOUR
## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT
**FLORIDA CODE § 68.082(1)(a)(1)-(2)**
**(Against all Defendants)**

71. All the preceding paragraphs are reincorporated by reference.

72. All the above allegations resulted in false claims to the state of Florida's Medicaid program.

73. As a result, the state of Florida has been damaged.

### COUNT FIVE
### VIOLATIONS OF THE TEXAS MEDICIAD FRAUD PREVENTION LAW
### TEXAS CODE § 36.002(1)-(2)
### (Against all Defendants)

74. All the preceding paragraphs are reincorporated by reference.

75. All the above allegations resulted in false claims to the Texas Medicaid program.

76. As a result, the state of Texas has been damaged.

### COUNT SIX
### VIOLATIONS OF THE ILLINOIS FALSE CLAIMS ACT
### 740 ILCS 175
### (Against all Defendants)

77. All the preceding paragraphs are reincorporated by reference.

78. All the above allegations resulted in false claims to the Medicaid program in the state of Illinois.

79. As a result the state of Illinois has been damaged.

### COUNT SEVEN
### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FINANCE LAW § 187 et seq.
### (Against all Defendants)

80. All the preceding paragraphs are reincorporated by reference.

81. All the above allegations resulted in false claims to the Medicaid program in the state of New York.

82. As a result the state of New York has been damaged.

### COUNT EIGHT
### VIOLATIONS OF THE TENNESSEE FALSE CLAIMS ACT

## TENNESSEE CODE § 4-18-103
### (Against all Defendants)

83. All the preceding paragraphs are reincorporated by reference.

84. All of the above allegations resulted in false claims to the Medicaid program in the state of Tennessee.

85. As a result the state of Tennessee has been damaged.

### RELIEF REQUESTED

86. Relator James Cesare, on his own behalf as well as on behalf of the United States asks the Court to enter judgment as follows: That the United States (a) be awarded three times the damages sustained because of the violations alleged herein in an amount to be proven at trial, as provided by the False Claims Act, 31 U.S.C. §§ 3729 et seq., and (b) that the maximum civil penalty under the federal False Claims Act be imposed for each and every false claim proven at trial; and (c) that pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in prosecuting this case; (d) that Relator be awarded the maximum relator's share possible under the federal False Claims Act; in addition, relator requests any alternative or supplemental relief the court may deem appropriate.

87. In addition, on behalf of the Commonwealth of Virginia and the states of California, Florida, Texas, Illinois, New York and Tennessee, relator asks the Court to enter judgment as follows: (a) that each state be awarded three times the damages it sustained because of the violations alleged, in an amount to be proven at trial, as provided in each state's false claims act; (b) that the maximum civil penalty under each state's false claims act be imposed for each and every false claim proven at trial; and (c) that pre and post-judgment interest be awarded, along with reasonable attorney's fees costs, and expenses

which the Relator necessarily incurred in prosecuting this case; (d) that Relator be awarded the maximum relator's share possible under each state's false claims act; in addition, relator requests any alternative or supplemental relief the court may deem appropriate.

88. Trial by jury is demanded.

DATED: 11/20/2017

                                      Respectfully Submitted by Relator through Counsel:

                                      Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 100
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
Email: zkitts@kglawpllc.com